**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Michael Holder, | No. CV-23-00763-PHX-JJT |
| Plaintiff, | **ORDER** |
| v. | |
| Bacus Foods Corporation, *et al.*, | |
| Defendants. | |

At issue are several motions filed in this matter. The first is Plaintiff's Motion for Conditional Certification of a Collective Action (Doc. 8) under the Fair Labor Standards Act ("FLSA"), to which Defendants filed a Response (Doc. 28) and Plaintiff filed a Reply (Doc. 32). The next set of motions is Defendant BFCJJS106 LLC's Motion to Dismiss for Lack of Personal Jurisdiction under Federal Rule of Civil Procedure 12(b)(2), Defendants' Motion to Dismiss and/or Transfer under Rule 12(b)(3), and Defendants' Motion to Compel Arbitration (Doc. 25), to which Plaintiff filed a Response (Doc. 39) and Defendants filed a Reply (Doc. 40). The last motion at issue is Defendants' Motion to Defer Ruling on Plaintiff's Motion for Conditional Certification (Doc. 29), to which Plaintiff filed a Response (Doc. 35) and Defendants filed a Reply (Doc. 38).

None of the parties have requested oral argument, which the Court finds unnecessary to resolve the various issues they have raised. *See* LRCiv 7.2(f). The Court now resolves the pending Motions in the manner set forth below, ultimately concluding that Plaintiff is obligated to participate in arbitration with Defendants to address his claims.

# I.       BACKGROUND

Plaintiff works as a delivery driver for a Jimmy John's store in Lincoln, Nebraska. On May 3, 2023, he filed a Class and Collective Action Complaint (Doc. 1), which he amended on May 9, 2023 (Doc. 7, First Amended Class and Collective Action Complaint ("FAC")). As Defendants, Plaintiff has named two individuals and two entities that, he alleges, make up a franchise group that owns and operates Jimmy John's stores across several states, including the store in Lincoln where he works.

The individual defendants are brothers Brandt and Jared Bacus (the "Bacus Brothers"), who sit atop the franchise group and reside in Arizona. The entity defendants are Bacus Foods Corporation ("BFC") and BFCJJS106 LLC ("Store 106 LLC"). BFC is an Arizona corporation owned and operated by the Bacus Brothers. Plaintiff alleges BFC owns and operates Jimmy John's stores in Arizona, Kansas, Colorado, and Nebraska, including Plaintiff's store in Lincoln—Store 106. (FAC ¶¶ 13–14.) Plaintiff alleges Store 106 is also owned by Store 106 LLC, a Nebraska limited liability company that is, in turn, owned and operated by BFC and the Bacus Brothers. (*Id*. ¶ 27.) According to Plaintiff, both entities have their principal place of business at the same address in Mesa, Arizona, which serves as a consolidated corporate headquarters. (*See id*. ¶¶ 12, 25.)

Plaintiff alleges Defendants unlawfully pay delivery drivers like himself less than minimum wage. More specifically, he alleges Defendants have failed to adequately reimburse drivers for their work-related expenses—principally, delivery-related vehicle expenses—thereby failing to pay them minimum wage in violation of the FLSA and the Nebraska Wage and Hour Act. He further alleges Defendants have failed to pay all wages due to delivery drivers and improperly diverted wages from them in violation of the Nebraska Wage Payment and Collection Act. He likens this case to other delivery-driver suits alleging violations of the Department of Labor's anti-kickback regulation, 29 C.F.R. § 531.35. *See, e.g.*, *Parker v. Battle Creek Pizza, Inc.*, 600 F. Supp. 3d 809, 812 (W.D. Mich. 2022) ("The principle is relatively simple: employers cannot shift business expenses to their employees if doing so drops the employees' wages below minimum wage.").

On May 9, 2023—the same day he filed the FAC—Plaintiff filed a Motion for Conditional Certification (Doc. 8). Plaintiff seeks an Order conditionally certifying this case as an FLSA collective action and authorizing notice to similarly situated delivery drivers employed at Defendants' Jimmy John's stores nationwide.

On May 30, 2023, Defendants filed an Expedited Motion requesting a stay of the briefing on Plaintiff's Motion for Conditional Certification or, alternatively, an extension of time in which to respond to it. (Doc. 19.) Defendants noted that because Plaintiff's Motion was filed before they were served with the FAC, they were in the unusual position of having to respond to Plaintiff's Motion before they were due to respond to the FAC. The Court declined Defendants' request for a stay, but granted their alternative request for an extension of time in which to respond to Plaintiff's Motion. (Doc. 20.) The Court permitted Defendants to file a formal request for the Court to defer ruling on Plaintiff's Motion, which they have since filed (Doc. 29) alongside their Response (Doc. 28).

On June 7, 2023, Defendants filed a Motion to Dismiss for Lack of Personal Jurisdiction under Rule 12(b)(2), Motion to Dismiss and/or Transfer under Rule 12(b)(3), and Motion to Compel Arbitration (Doc. 25, "Defendants' Dispositive Motions"). Defendants seek an Order dismissing this case, transferring it to another district, or compelling Plaintiff to participate in arbitration—prior to the issuance of notice to the proposed FLSA class. In support, Defendants provide a declaration by Brandt Bacus disputing some of Plaintiff's allegations about the structure of the franchise group and presenting an arbitration agreement Plaintiff signed with another Bacus-owned entity.

According to Brandt Bacus, BFC does not operate any stores in Nebraska and does not have any employees in that state; it only operates stores in Arizona. (Doc. 25-2, Declaration of Brandt Bacus ("First Bacus Decl."), ¶¶ 21–24.) The Nebraska stores are operated by another entity owned and operated by the Bacus Brothers called BFCNE, which is incorporated in Nebraska. (*Id*. ¶¶ 2–3.) BFCNE, in turn, operates each Nebraska store through a separate limited liability company. (*Id*. ¶ 4.) Store 106 is operated by Store

106 LLC. (*Id.* ¶ 13.) Store 106 LLC has no employees or managers; its employees are employed by BFCNE. (*Id.*) Plaintiff's employment agreement is with BFCNE. (*Id.* ¶ 9.)

When Plaintiff was hired at Store 106, he signed a Dispute Resolution Procedure & Mutual Binding Arbitration Agreement with BFCNE. (First Bacus Decl., Ex. A (the "Arbitration Agreement").) According to Mr. Bacus, the Arbitration Agreement was a component of Plaintiff's employment agreement. (First Bacus Decl. ¶¶ 9–11, 19.) The Arbitration Agreement outlines a three-step procedure for addressing "any claims, disputes, or controversies arising between [Plaintiff] and BFCNE . . . , which could give rise to a legal claim relating to [Plaintiff's] employment with [BFCNE] or the termination thereof, including the interpretation or application of this . . . Agreement." The final step is "binding arbitration under the Federal Arbitration Act." The parties agreed the outlined procedure would be "the exclusive means of redress for any disputes relating to or arising from [Plaintiff's] employment with [BFCNE], whether such disputes are initiated by [Plaintiff] or [BFCNE] . . . ." Plaintiff could choose to opt out of the arbitration provisions without penalty. To do so, he had to notify Human Resources via email at an address with a "bacusfoodscorp.com" domain or mail at the aforementioned address in Mesa, Arizona. According to Mr. Bacus, Plaintiff did not choose to opt out. (First Bacus Decl. ¶ 20.)

Plaintiff does not deny he signed the Arbitration Agreement with BFCNE. He argues the agreement does not cover this dispute, however, because he has not named BFCNE as a defendant and those he has named are neither signatories to the agreement, nor referenced in it. Plaintiff disputes that the Arbitration Agreement was part of his contract for employment at Store 106; he argues it is a standalone contract. He posits "there appears to be no support for Defendants' contention that BFCNE is Plaintiff's employer." (Doc. 39 at 10, 13.) He claims "he has no knowledge of or experience with the entity, other than, apparently, having hurriedly e-signed an arbitration agreement with them." (*Id.* at 8.) He disputes Defendants' suggestion that Store 106 LLC is "just a financial vehicle that has no employees." (*Id.* at 13 n.11.) He shows that Store 106 LLC—not BFCNE—appears on his paystubs and W-2 tax forms. (*See* Docs. 39-3, 39-4.) He presents a document from the

nonprofit news organization ProPublica showing that Store 106 LLC received a Paycheck Protection Program ("PPP") loan for more than $90,000 in 2021. (Doc. 39-6.) According to ProPublica, Store 106 LLC reported it had 38 employees. (*Id*.) Plaintiff asserts that "BFCNE, on the other hand, did not receive a PPP loan." (Doc. 39 at 13 n.11.)

Defendants reply with a supplemental declaration by Brandt Bacus. Mr. Bacus asserts that the Arbitration Agreement is indeed a "sub-part" of Plaintiff's employment agreement with BFCNE. (Doc. 40, Declaration of Brandt Bacus ("Second Bacus Decl."), ¶¶ 2–3.) The Arbitration Agreement is contained within a BFCNE "New Hire Packet." (Second Bacus Decl., Ex. A.) Plaintiff completed the packet, in its entirety, on November 19, 2021. The cover page states Plaintiff was hired to work at Store 106 on November 19, 2021. (*Id*. at 1.) An I-9 Employment Eligibility Form within the packet shows his first day of work was to be November 22, 2021. (*Id*. at 17.[1]) On November 22, 2021, a BFCNE manager countersigned various agreements in the packet, including the Arbitration Agreement. (*Id*. at 11.) Other agreements include "Rules for Employment" and a "BFCNE Inc Driver Agreement and Eligibility Policy." (*Id*. at 4, 7.) The latter agreement described terms for "acceptance and commencement of hire by BFCNE Inc as a delivery driver"; explained that delivery drivers are compensated "in accordance with federal and state laws governing tipped employees"; and referenced reimbursements relating to the use of Plaintiff's vehicle in the course of his employment. (*Id*. at 7–8.)

Defendants thus contend the Arbitration Agreement encompasses this dispute and requires that Plaintiff participate in arbitration to address his claims rather than litigate them before this Court. Plaintiff maintains the Arbitration Agreement does not apply.

. . . .

. . . .

. . . .

---

[1] The date Plaintiff alleged he began working at Store 106 was around the same time, on November 27, 2021. (FAC ¶ 116.)

## II.     ANALYSIS

### A.     Defendants' Motion to Defer Ruling on Plaintiff's Motion for Conditional Certification

In chronological order, the first Motion at issue is Plaintiff's Motion for Conditional Certification. However, Defendants have asked the Court to defer ruling on Plaintiff's Motion until it resolves their Dispositive Motions. The Court grants Defendants' request.

The Court has inherent authority "to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants. How this can best be done calls for the exercise of judgment, which must weigh competing interests and maintain an even balance." *Landis v. North Am. Co.*, 299 U.S. 248, 254–55 (1936). Here, the Court finds the balance weighs in favor of prioritizing adjudication of Defendants' Dispositive Motions. The interest of efficiency weighs most heavily. The Court agrees with the proposition that "when faced with dueling motions to dismiss or greatly expand an action, the need to most efficiently use litigant and court resources counsels in favor of first addressing the former." *Cobble v. 20/20 Commc'ns, Inc.*, No. 2:17-CV-53-TAV-MCLC, 2017 WL 4544598, at *4 (E.D. Tenn. Oct. 11, 2017).

Further, Defendants' requested relief includes compelling Plaintiff to participate in arbitration. "The arbitrability of a dispute is a 'gateway' issue, meaning that 'a court should address the arbitrability of the plaintiff's claim at the outset of the litigation.'" *Jin v. Parsons Corp.*, 966 F.3d 821, 827 (D.C. Cir. 2020) (quoting *Reyna v. Int'l Bank of Com.*, 839 F.3d 373, 376, 378 (5th Cir. 2016)); *see, e.g.*, *Bogle v. Wonolo, Inc.*, No. 2:21-CV-08878-MCS-KS, 2022 WL 1124973, at *5 (C.D. Cal. Apr. 8, 2022) ("The Court properly may decide whether an individual's FLSA claims are subject to arbitration before deciding whether conditional certification is appropriate." (citing *Reyna*, 839 F.3d at 376)). The Court is not swayed by Plaintiff's argument that deferring ruling on his Motion prejudices potential opt-in plaintiffs. As Defendants observe, any delay in court-approved notice does not affect these individuals' ability to prosecute their own lawsuits or intervene in this one.

Accordingly, while the Court acknowledges the issue of priority in these circumstances is not fully settled, it joins those courts in this district that have considered dispositive motions—including motions to compel arbitration—before motions for conditional certification. *See, e.g.*, *Gillespie v. Cracker Barrel Old Country Store Inc.*, No. CV-21-00940-PHX-DJH, 2021 WL 5280568, at *2–3 (D. Ariz. Nov. 12, 2021) (denying motion for conditional certification of FLSA class with leave to refile proposing class not bound by arbitration agreement). The Court now turns to Defendants' Dispositive Motions.

**B.     Store 106 LLC's Motion to Dismiss for Lack of Personal Jurisdiction**

Defendants first move to dismiss the claims against Store 106 LLC under Rule 12(b)(2), arguing this Court lacks personal jurisdiction over the company.

**1.     Legal Standard**

For a federal court to adjudicate a matter, it must have jurisdiction over the parties. *Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 701 (1982). "When a defendant moves to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of demonstrating that the court has jurisdiction." *In re W. States Wholesale Nat. Gas Antitrust Litig.*, 715 F.3d 716, 741 (9th Cir. 2013). "Because there is no statutory method for resolving [personal jurisdiction], the mode of its determination is left to the trial court." *Data Disc, Inc. v. Sys. Tech. Assocs., Inc.*, 557 F.2d 1280, 1285 (9th Cir. 1977).

"When a district court acts on a defendant's motion to dismiss under Rule 12(b)(2) without holding an evidentiary hearing, the plaintiff need only make a prima facie showing of jurisdictional facts to withstand the motion to dismiss." *Ballard v. Savage*, 65 F.3d 1495, 1498 (9th Cir. 1995). The uncontroverted facts alleged in the complaint are generally accepted as true, but the court "may not assume the truth of allegations in a pleading which are contradicted by affidavit." *Data Disc*, 557 F.2d at 1284. "[C]onflicts between the facts contained in the parties' affidavits must be resolved in [the plaintiff's] favor." *Rio Props., Inc. v. Rio Int'l Interlink*, 284 F.3d 1007, 1019 (9th Cir. 2002) (citation omitted).

To establish personal jurisdiction over a nonresident defendant, the plaintiff must show that the forum state's long-arm statute confers jurisdiction over the defendant and

that the exercise of jurisdiction comports with constitutional principles of due process. *Id.*; *Omeluk v. Langsten Slip & Batbyggeri A/S*, 52 F.3d 267, 269 (9th Cir. 1995). Arizona's long-arm statute allows the exercise of personal jurisdiction to the same extent as the United States Constitution. *See* Ariz. R. Civ. Proc. 4.2(a); *Cybersell v. Cybersell*, 130 F.3d 414, 416 (9th Cir. 1997); *A. Uberti & C. v. Leonardo*, 892 P.2d 1354, 1358 (Ariz. 1995) (stating that under Rule 4.2(a), "Arizona will exert personal jurisdiction over a nonresident litigant to the maximum extent allowed by the federal constitution"). Thus, a court in Arizona may exercise personal jurisdiction over a nonresident defendant so long as doing so accords with constitutional principles of due process. *Cybersell*, 130 F.3d at 416.

Due process requires that a non-resident, non-consenting defendant have sufficient minimum contacts with the forum state so that "maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)); *see Mallory v. Norfolk S. Ry. Co.*, 143 S. Ct. 2028, 2039 (2023) (reaffirming that personal jurisdiction exists where a defendant has consented to suit). Courts recognize two forms of contacts-based personal jurisdiction within the confines of due process: "(1) 'general jurisdiction' which arises when a defendant's contacts with the forum state are so pervasive as to justify the exercise of jurisdiction over the defendant in all matters; and (2) 'specific jurisdiction' which arises out of the defendant's contacts with the forum state giving rise to the subject litigation." *Birder v. Jockey's Guild, Inc.*, 444 F. Supp. 2d 1005, 1008 (C.D. Cal. 2006).

### 2.    Analysis

Plaintiff first argues Store 106 LLC is subject to general jurisdiction in this Court. For this to be true, the company's affiliations with Arizona must be "so continuous and systematic" as to render it "essentially at home" there. *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011). For corporations, the paradigmatic forums are where they are incorporated or have their "principal place of business." *Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014). In *Hertz Corporation v. Friend*, the Supreme Court

held the latter term refers to the corporation's "nerve center," where its "high level officers direct, control, and coordinate the corporation's activities." 559 U.S. 77, 80–81 (2010).[2]

Plaintiff does not dispute that Store 106 LLC is organized in Nebraska, but contends its principal place of business is in Arizona. As noted, Plaintiff alleges Store 106 LLC is owned and operated by the Bacus Brothers, who have ultimate control over their stores' operations and finances. (FAC ¶¶ 38–73.) Plaintiff points to his declaration, in which he recounts that a Nebraska-based manager, Brian Giles, told him the company's owners and Human Resources department set reimbursement rates for delivery drivers. (Doc. 8-1 ¶ 20.) Plaintiff shows that Store 106 LLC lists Brandt Bacus as its managing member on reports filed with the Nebraska Secretary of State. (Doc. 39-2 at 13.) Those reports list the aforementioned address in Mesa, Arizona, as its principal office.[3] (*Id.*) Plaintiff's paystubs and W-2 tax forms list the same address for the company. (Docs. 39-3, 39-4.) This address is listed as the principal office of numerous other Bacus-owned entities. (Doc. 39-2 at 7, 11–36.) The building at that address has a Bacus Foods Corp. sign out front. (Doc. 39-1.)

Defendants maintain that Store 106 LLC's principal place of business is the store itself in Lincoln, Nebraska. According to Brandt Bacus, Store 106 LLC operates only that single store and is not licensed to do business in Arizona. (First Bacus Decl. ¶¶ 13, 17–18.) It has no employees or managers; its employees are employed by BFNCE. (*Id* ¶ 13.) While Store 106 LLC runs its own payroll and its employees receive paychecks bearing its name, this is only to track the store's financial metrics. (*Id*. ¶¶ 13–14; Second Bacus Decl. ¶ 5.) Mr. Giles serves as BFCNE's Nebraska-based Director of Operations. (First Bacus Decl. ¶¶ 6–7.) He manages the stores' "day-to-day" operations from that state. (*Id.*)

Defendants argue that because Store 106 LLC's operations and on-the-ground business decisions take place in Nebraska, its principal place of business must be there.

---

[2] The parties here assume the principles governing personal jurisdiction over corporations apply to limited liability companies. They give no reason to depart from this assumption, which other courts have followed. *See, e.g.*, *Athena Cosmetics, Inc. v. U.S. Warehouse*, No. CV-19-8466-MWF (MRW), 2020 WL 1969260, at *4 (C.D. Cal. Mar. 5, 2020).

[3] Under Nebraska law, the principal office of an LLC "means the principal executive office . . . whether or not the office is located in this state." Neb. Rev. Stat. § 21-102(17).

That is not necessarily the case. *Hertz*'s nerve-center test focuses not on where a "company's business activities visible to the public take place," but where "its top officers direct those activities." 559 U.S. at 96. "Sometimes a corporation will conduct many of its 'on the ground' operations in one state but its principal place of business will be in another." *Big Shoulders Cap. LLC v. San Luis & Rio Grande Ry., Inc.*, 13 F.4th 560, 573 (7th Cir. 2021); *see, e.g.*, *Cent. W. Va. Energy Co., Inc. v. Mountain State Carbon, LLC*, 636 F.3d 101, 103–04 (4th Cir. 2011) (explaining *Hertz* displaced the "place of operations test" which had looked to "the place where the bulk of corporate activity occurs").

Defendants cite two cases in support of the proposition that the principal place of business is where on-the-ground business decisions are made. The Court reads these cases differently, and they are distinguishable in any event. In *Thunder Properties, Inc. v. Wood*, a corporation argued its principal place of business was in California, where the lead executive made "virtually all" decisions relating to operations. No. CV-14-00068-RCJ-WGC, 2017 WL 777183, at *2 (D. Nev. Feb. 28, 2017). But like Store 106 LLC, the corporation's argument in *Wood* was contradicted by the fact that it had listed its corporate address in Nevada. *Id.* Based on this and the fact that its president resided in Nevada—where he acted as the "man on the ground" handling "various important aspects of the business"—the court found the corporation's principal place of business was in Nevada. *Id.* By contrast, the court found in *Tran v. Tran* that a corporation's principal place of business was in Texas and not California, where it had listed its mailing address. No. CV-A-17-510 LY, 2017 WL 7736133, at *2 (W.D. Tex. Aug. 25, 2017), *report and recommendation adopted*, 2017 WL 7736133 (W.D. Tex. Oct. 3, 2017). But the court made this finding based on evidence that "all control over the corporation and its business is centered in Texas." *Id.* While the president resided in California, she claimed to return to Texas whenever she was needed. *Id.* Defendants have made no similar claim here.

The Court finds Plaintiff has met his burden of showing that Store 106 LLC's principal place of business is in Arizona. His evidence and uncontroverted allegations support the conclusion that Store 106 LLC lists its principal address in Mesa because that

is the location of the nerve center from which the Bacus Brothers direct, control, and coordinate its activities. Defendants' evidence does not meaningfully contradict this theory. It shows only that Store 106 LLC's operations and on-the-ground decisions take place in Nebraska. By all accounts, however, Arizona appears to be "the place where the buck stops." *Harrison v. Granite Bay Care, Inc.*, 811 F.3d 36, 39–42 (1st Cir. 2016) (finding corporation's principal place of business was in New Hampshire, where its owners exercised ultimate control, and not Maine, where its day-to-day operations took place).

### C.    Defendants' Motion to Dismiss and/or Transfer

Next, Defendants move to dismiss and/or transfer this case under Rule 12(b)(3), arguing venue is improper in this district because Store 106 LLC does not reside in Arizona. Having found Store 106 LLC's principal place of business is in Arizona, the Court must disagree. *See* 28 U.S.C. § 1391(c)(2) (providing that, for venue purposes, a defendant entity "shall be deemed to reside . . . in any judicial district in which such defendant is subject to the court's personal jurisdiction with respect to the civil action in question"). As all named Defendants reside in Arizona, venue is properly laid in this district. *See id.* § 1391(b)(1).

### D.    Defendants' Motion to Compel Arbitration

Lastly, Defendants argue Plaintiff is obligated to participate in arbitration to address this dispute pursuant to the terms of his Arbitration Agreement with BFCNE. Accordingly, Defendants move to dismiss this case or, alternatively, stay the case pending arbitration.

#### 1.    Legal Standard

In resolving a motion to compel arbitration under the Federal Arbitration Act ("FAA"), "the district court's role is limited to determining whether a valid arbitration agreement exists and, if so, whether the agreement encompasses the dispute at issue. If the answer is yes to both questions, the court must enforce the agreement." *Lifescan, Inc. v. Premier Diabetic Servs., Inc.*, 363 F.3d 1010, 1012 (9th Cir. 2004). The FAA constitutes a congressional mandate "that federal courts 'rigorously enforce agreements to arbitrate.'" *Coup v. Scottsdale Plaza Resort, LLC*, 823 F. Supp. 2d 931, 940 (D. Ariz. 2011) (quoting *Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 221 (1985)). "By its terms, the FAA

leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to arbitration on issues as to which an arbitration agreement has been signed." *Id.* (cleaned up and citation omitted). "In construing the terms of an arbitration agreement, the district court 'appl[ies] general state-law principles of contract interpretation, while giving due regard to federal policy in favor of arbitration by resolving ambiguities as to the scope of arbitration in favor of arbitration.'" *Id.* at 940–41 (quoting *Wagner v. Stratton Oakmont, Inc.*, 83 F.3d 1046, 1049 (9th Cir. 1996)).

The FAA provides that upon being satisfied an issue is referable to arbitration, the court "shall on application of one of the parties stay the trial of the action pending arbitration until such arbitration has been had in accordance with the terms of the agreement," provided the stay applicant is not in default. 9 U.S.C. § 3. Notwithstanding this language, the Ninth Circuit has held district courts "may either stay the action or dismiss it outright when . . . the court determines that all of the claims raised in the action are subject to arbitration." *Forrest v. Spizzirri*, 62 F.4th 1201, 1204–05 (9th Cir. 2023) (quoting *Johnmohammadi v. Bloomingdale's, Inc.*, 755 F.3d 1072, 1074 (9th Cir. 2014)).

### 2. Analysis

As noted, Plaintiff does not deny he signed the Arbitration Agreement with BFCNE. He argues Defendants cannot compel arbitration, however, because they are neither signatories to the agreement, nor referenced in it. Defendants concede they are not signatories, but argue they nonetheless can compel Plaintiff to participate in arbitration. Their principal arguments for doing so invoke the theory of alternative estoppel.[4]

. . . .

---

[4] Defendants argue the Court should not even reach these arguments because there is "clear and unmistakable evidence" the parties agreed to delegate threshold arbitrability questions to the arbitrator. *See Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 530 (2019). But Defendants were not signatories to the Arbitration Agreement. They fail to point to clear and unmistakable evidence that the parties agreed to arbitrate whether nonsignatories may compel arbitration, an issue as to which the agreement is silent. *See Newman v. Plains All Am. Pipeline, LP*, 23 F.4th 393, 398 (5th Cir. 2022) ("[D]eciding an arbitration agreement's enforceability between parties remains a question for courts.").

### a.     Alternative Estoppel

A willing nonsignatory may compel an unwilling signatory to participate in arbitration under an alternative estoppel theory "when the relationship of the persons, wrongs and issues involved is a close one." *CD Partners, LLC v. Grizzle*, 424 F.3d 795, 798–99 (8th Cir. 2005). Defendants essentially offer three reasons why the theory applies here. First, they argue, Plaintiff's claims are based on Defendants' status as his joint employers along with BFCNE and it would be unfair to allow Plaintiff to artfully plead around the Arbitration Agreement by leaving out BFCNE. Second, Plaintiffs' claims are sufficiently related to his employment agreement with BFCNE that it would be unfair to allow him to avoid the Arbitration Agreement contained within it. Third, the relationship between BFCNE and Defendants is "sufficiently close that only by permitting the nonsignatory [Defendants] to invoke arbitration may evisceration of the underlying arbitration agreement between the signatories be avoided." *Id.* at 798 (quoting *MS Dealer Serv. Corp. v. Franklin*, 177 F.3d 942, 947 (11th Cir. 1999), *abrogated on other grounds by Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 631 (2009).

As an initial matter, although Defendants claim each of these arguments relies on alternative estoppel, their use of the term is imprecise. As Plaintiff points out, "[a]lternative estoppel typically relies, at least in part, on the claims being so intertwined with the agreement containing the arbitration clause that it would be unfair to allow the signatory to rely on the agreement in formulating its claims but to disavow availability of the arbitration clause of that same agreement." *PRM Energy Sys. v. Primenergy, LLC*, 592 F.3d 830, 834 (8th Cir. 2010). While Defendants' first two arguments rely on estoppel, their third argument has roots in agency. *See id.* (noting a nonsignatory may compel arbitration under "agency and related principles . . . when, as a result of the nonsignatory's close relationship with a signatory, a failure to do so would eviscerate the arbitration agreement" (citing *Grizzle*, 424 F.3d at 798)). The Court turns first to Defendants' estoppel arguments.

The threshold question is whether alternative estoppel is available in this case, which is a question of state contract law. *See Carlisle*, 556 U.S. at 630–32.[5] The Court must first determine which state's contract law will provide the answer. Defendants contend that Nebraska law governs because Nebraska has the most significant relationship to the Arbitration Agreement and the parties to it. Plaintiff does not dispute this, nor does he suggest that any other state's contract law should govern. The Court therefore considers the availability of alternative estoppel under Nebraska law.[6]

Defendants do not cite to any case in which the Nebraska Supreme Court has adopted the theory of alternative estoppel to allow a nonsignatory to compel a signatory to participate in arbitration. The Court has not located one either. "Where the state's highest court has not decided an issue, the task of the federal courts is to predict how the state high court would resolve it." *Giles v. Gen. Motors Acceptance Corp.*, 494 F.3d 865, 872 (9th Cir. 2007) (citation omitted). In service of this task, Defendants point to *Ordosgoitti v. Werner Enterprises, Inc.*, a District of Nebraska case in which the court permitted a nonsignatory to enforce a class-action waiver against a signatory under an alternative estoppel theory. No. 8:20-CV-421, 2022 WL 874600, at *7–10 (D. Neb. Mar. 24, 2022). In that case, as in this one, the court first had to determine whether the Nebraska Supreme Court would adopt alternative estoppel to allow a nonsignatory to enforce contract provisions against a party to the contract. *Id*. at *7. The court had "little hesitation" concluding the Nebraska Supreme Court would do so. *Id*.

---

[5] Plaintiff makes much of the Supreme Court's statement in *Epic Systems Corporation v. Lewis* that the FAA requires courts "rigorously to enforce arbitration agreements according to their terms, including terms that specify *with whom* the parties choose to arbitrate their disputes." 138 S. Ct. 1612, 1621 (2018) (emphasis in original) (citation and quotation marks omitted). The issue in *Epic Systems* was whether the National Labor Relations Act's guarantee of the right to engage in "concerted activities for the purpose of collective bargaining or other mutual aid or protection" protected the right to pursue collective or class action lawsuits notwithstanding a contrary and otherwise enforceable arbitration agreement. *Id*. at 1624–26. The Supreme Court did not consider in that case how or whether nonsignatories may enforce arbitration agreements, which it previously held to be a question of state contract law. *See Carlisle*, 556 U.S. at 630–32. The Court fails to see how *Epic Systems* sheds light on whether Defendants may enforce the Arbitration Agreement.

[6] The Court notes the question would have a more straightforward answer under Arizona law, which recognizes alternative estoppel. *See Sun Valley Ranch 308 Ltd. P'ship ex rel. Englewood Props., Inc. v. Robson*, 294 P.3d 125, 134–35 (Ariz. Ct. App. 2012).

Alternative estoppel relies on principles of equity and estoppel—it is also called "equitable estoppel." *See In re Wholesale Grocery Prods. Antitrust Litig.*, 707 F.3d 917, 922 n.7 (8th Cir. 2013). As the court noted in *Ordosgoitti*, the Nebraska Supreme Court has applied equitable estoppel "to transactions in which it is found that it would be unconscionable to permit a person to maintain a position inconsistent with one in which he or she has acquiesced or of which he or she has accepted any benefit." *Brick Dev. v. CNBT II LLC*, 918 N.W.2d 824, 833 (Neb. 2018) (citing *Becher v. Becher*, 908 N.W.2d 12 (Neb. 2018)). While Nebraska's high court has yet to apply those principles to compel a nonsignatory to participate in arbitration, it has noted other jurisdictions have done just that. *See Pearce v. Mut. of Omaha Ins. Co.*, 876 N.W.2d 899, 906–07 (Neb. 2016) (acknowledging but declining to address equitable estoppel argument not preserved for appeal). Accordingly, the court noted in *Ordosgoitti* that other courts in the District of Nebraska "have applied alternative estoppel to allow nonsignatories to enforce arbitration clauses against signatories to an agreement." 2022 WL 874600, at *7 (collecting cases).

The Court finds this analysis persuasive, and Plaintiff has not argued to the contrary. The Court therefore follows suit and predicts the Nebraska Supreme Court would adopt alternative estoppel to allow a nonsignatory to compel a signatory to arbitrate their dispute.

As noted, alternative estoppel typically relies on the claims against the nonsignatory being so "intertwined" with the agreement containing the promise to arbitrate that it would be unfair to allow the signatory to avoid arbitration. *PRM Energy*, 592 F.3d at 835. In an influential opinion, the Eleventh Circuit explained the theory applies in two circumstances: first, when the signatory "must rely on the terms of . . . [,] makes reference to[,] or presumes the existence of" the agreement containing the promise to arbitrate in formulating its claims such that the claims "arise out of and relate directly to the . . . agreement"; and second, when "the signatory . . . raises allegations of substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the [agreement]." *MS Dealer*, 177 F.3d at 947 (cleaned up and citations omitted).

For the first circumstance to apply here, two things must be true. First, the Arbitration Agreement must be part of a broader employment agreement between Plaintiff and BFCNE. Second, Plaintiff's claims must rely on, make reference to, or presume the existence of that broader agreement such that his claims arise out of and relate directly to it. *Id.* Plaintiff disputes both points. He first argues the Arbitration Agreement is a standalone contract that "is not intertwined with his employment." (Doc. 39 at 10.) He argues that "[w]hile many contracts, including some employment contracts, include arbitration agreements within contracts that also create other contractual rights, that is not the situation here." (*Id.*) He maintains the Arbitration Agreement is "just an arbitration contract" that "contains no terms or conditions of employment." (*Id.*) He claims the "two arrangements—Plaintiff's employment and his agreement to arbitration with BFCNE—are independent of one another." (*Id.*) Plaintiff's arguments are inconsistent with the evidence.

The evidence shows the Arbitration Agreement was but one component of a BFCNE "New Hire Packet" containing multiple agreements governing the terms and conditions of Plaintiff's employment. Plaintiff completed and signed the entirety of this packet on the same day, shortly before he started work. The rules of contract interpretation instruct that "[i]nstruments made in reference to and as a part of a transaction"—here, Plaintiff's hiring at Store 106—"should be considered and construed together." *Props. Inv. Grp. of Mid-Am. v. Applied Commc'ns, Inc.*, 495 N.W.2d 483, 490 (Neb. 1993). Thus, the Arbitration Agreement must be considered as part of a broader employment agreement with BFCNE.

The evidence also supports the conclusion that Plaintiff's claims are intertwined with his employment agreement with BFCNE. Plaintiff acknowledges his claims are "based on his employment contract/relationship with Defendants" as a delivery driver for Store 106. (Doc. 39 at 10.) According to Brandt Bacus, Plaintiff's contract for employment at Store 106 is with BFCNE. Plaintiff has not produced any other "employment contract." While Plaintiff claims he has no knowledge of BFCNE and denies it is his employer, his claims ring hollow in light of the evidence. At most, Plaintiff's evidence shows that Store 106 LLC is the entity that directly pays him and that the lines between Store 106 LLC and

BFCNE are occasionally disregarded. But it does not contradict that Store 106 LLC is controlled and wholly owned by BFCNE. Nor does it cast doubt on Defendants' contention that any "employment relationship" they have with Plaintiff runs through BFCNE.[7]

In analogous circumstances, the Ninth Circuit estopped a plaintiff from avoiding her agreement to arbitrate "all disputes that may arise out of or be related to [her] employment." *Franklin v. Cmty. Reg. Med. Ctr.*, 998 F.3d 867, 869, 874–76 (9th Cir. 2021). There, a nurse sued the hospital to which she was assigned—but not the staffing agency that employed her and with whom she had signed the arbitration agreement—for wage-and-hour violations under the FLSA and California law, among other claims. *Id*. at 870. The Ninth Circuit held the plaintiff could not avoid arbitration simply by naming only the hospital as a defendant, given that the substance of her wage-and-hour claims was "rooted in her employment relationship with [the agency]." *Id*. at 875 (citing *Garcia v. Pexco, LLC*, 217 Cal. Rptr. 3d, 793, 796 (App. 2017)); *see Grigson v. Creative Artists Agency, LLC*, 210 F.3d 524, 530 (5th Cir. 2000) (describing an action against only nonsignatories as "a quite obvious, if not blatant, attempt to bypass the agreement's arbitration clause").

The same conclusion would seem to follow here, where the relationship between the nonsignatory Defendants and signatory non-defendant—BFCNE—is even closer. On the other hand, the Ninth Circuit in that case was applying California law. *See Franklin*, 998 F.3d at 871. Whether the analysis necessarily would be the same under Nebraska law is unclear. Applying Oklahoma law to analogous circumstances in *Reeves v. Enterprise Products Partners, LP*, for example, the Tenth Circuit held the plaintiffs' wage-and-hour claims against the company to which they were assigned did not arise out of their

---

[7] To illustrate: Plaintiff alleges Store 106 LLC is liable primarily based on its control over the terms and conditions of his employment. (FAC ¶¶ 30–35.) Defendants' evidence shows such control is exercised through Store 106 LLC's sole member, BFCNE. (First Bacus Decl. ¶¶ 4, 13–15.) Plaintiff alleges each of the Bacus Brothers is liable primarily "by virtue of his role as owner and operator of the Defendant entities." (FAC ¶¶ 42–53, 60–71.) Defendants' evidence shows the Bacus Brothers own and operate their stores through state-level entities; they operate Plaintiff's store through BFCNE. (First Bacus Decl. ¶¶ 2–8, 21–26.) As for BFC, Defendants' evidence suggests it has little connection to Plaintiff's employment. (*Id*. ¶¶ 21–24.) But even if Plaintiff's allegations are accepted as true, the evidence suggests BFC's connection to Plaintiff would still run through BFCNE.

1    employment agreements with staffing agencies, who were not named as defendants. *See*

2    17 F.4th 1008, 1013 (10th Cir. 2021).[8]

3         The Tenth Circuit nonetheless held the plaintiffs were estopped from avoiding the

4    arbitration clauses in their employment agreements. *Id*. at 1013–15. The court reached this

5    conclusion by application of the second circumstance triggering alternative estoppel:

6    "when the signatory raises allegations of substantially interdependent and concerted

7    misconduct by both the nonsignatory and one or more of the signatories to the contract."

8    *Id*. (citing *MS Dealer*, 177 F.3d at 947). While the plaintiffs had "carefully left out" any

9    claims against the staffing agencies that employed them, the agencies actually paid their

10   wages and would have to become involved in litigating their wage-and-hour claims. *Id*. at

11   1013–14. The claims were thus "integrally related" to the plaintiffs' employment

12   agreements and alleged "substantially interdependent and concerted misconduct" by both

13   the staffing agencies and the company to which they were assigned. *Id*. at 1015; *see Ragone*

14   *v. Atl. Video at Manhattan Ctr.*, 595 F.3d 115 (2d Cir. 2010) (estopping plaintiff from

15   avoiding arbitration with both signatory employer and non-signatory joint employer);

16   *Bonner v. Mich. Logistics Inc.*, 250 F. Supp. 3d 388, 397 (D. Ariz. 2017) ("[Plaintiffs]

17   cannot be permitted to argue Defendants are joint employers while, at the same time, argue

18   their relationship is not so close that all Defendants cannot compel arbitration." (citations

19   and quotation marks omitted)). Indeed, the Tenth Circuit found it "'especially inequitable'

20   when a 'signatory non-defendant' . . . 'is charged with interdependent and concerted

21   misconduct with a nonsignatory defendant' . . . and the signatory 'in essence' becomes a

22   party to the litigation.'" *Reeves*, 17 F.4th at 1013 (quoting *Grigson*, 210 F.3d at 528).

23   _____

     [8] The Eighth Circuit has similarly contrasted claims arising "directly from violations of the
24   terms of a contract containing an arbitration clause" and statutory claims that relate to the
     subject matter of such contracts but "exist independently" of them. *See Wholesale Grocery*,
25   707 F.3d at 923 (citing *PRM Energy*, 592 F.3d at 832–33, and *Grizzle*, 424 F.3d at 797).
     However, the statutory claims considered by the Eighth Circuit were antitrust conspiracy
26   claims, which may be brought by "any person who shall be injured in his business or
     property by reason of" such conspiracy whether or not they have a contractual relationship
27   with the defendant. *Id*. (quoting 15 U.S.C. § 15). Here, by contrast, Plaintiff acknowledges
     his claims "are based on his employment contract/relationship with Defendants." (Doc. 39
28   at 10.) Thus, there is a stronger argument that Plaintiff's claims "'rely on' and have an
     'intimate and intertwined relationship with [his employment contract with BFCNE] such
     that equitable estoppel should apply." *See id*. (cleaned up and citation omitted).

Similarly, Plaintiff here has left out any claims against BFCNE, with whom he signed the employment agreement containing the Arbitration Agreement. Plaintiff's wage-and-hour claims are nonetheless intertwined with that agreement and the misconduct he alleges is substantially interdependent and concerted as between BFCNE and Defendants; the former is the piece that connects the puzzle of his employment relationships with the latter. The Court therefore finds Plaintiff is estopped from avoiding his agreement to arbitrate "any disputes relating to or arising from [his] employment with [BFCNE]."[9]

### b.    Scope

Next, the parties dispute whether the Arbitration Agreement encompasses Plaintiff's claims. For example, Plaintiff notes the agreement contains a provision listing examples of covered claims relating to discrimination and harassment. However, the Arbitration Agreement expressly states that any disputes regarding its "interpretation or application" are subject to the procedure outlined therein. In describing the final step of this procedure, the Arbitration Agreement incorporates the arbitration rules promulgated by JAMS and the AAA. The Court agrees with Defendants that these provisions constitute "clear and unmistakable evidence that the contracting parties agreed to arbitrate arbitrability." *Brennan v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015). Thus, the Court must leave disputes concerning the scope of the Arbitration Agreement to be resolved in arbitration.

### c.    Unconscionability

Lastly, Plaintiff argues the Arbitration Agreement is procedurally and substantively unconscionable, which are independent grounds under Nebraska law. *See Ficke v. Wolken*, 858 N.W.2d 249, 258 (Neb. Ct. App. 2014) ("A contract can be either procedurally or substantively unconscionable." (citing *Adams v. Am. Cyanamid Co.*, 498 N.W.2d 577 (Neb. Ct. App. 1992)). Plaintiff's arguments cannot succeed under current law.

---

[9] In light of this conclusion, the Court need not reach Defendants' argument that their relationship with BFCNE is "sufficiently close that only by permitting [Defendants] to invoke arbitration may evisceration of the underlying arbitration agreement between the signatories be avoided." *Grizzle*, 424 F.3d at 798. The Court notes, however, that this theory would likely be a viable one considering the evidence discussed herein. *See Sam Reisfeld & Son Import Co. v. S.A. Eteco*, 530 F.2d 679, 681 (5th Cir.1976) ("If the parent corporation was forced to try the case, the arbitration proceedings would be rendered meaningless and the federal policy in favor of arbitration effectively thwarted.").

Plaintiff argues the Arbitration Agreement is procedurally unconscionable based on the "clear disparity in respective bargaining positions of parties." (Doc. 39 at 16.) The Supreme Court has held "mere inequality in bargaining power, however, is not a sufficient reason to hold that arbitration agreements are never enforceable in the employment context." *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 33 (1991). As Defendants note, arbitration was not a condition of Plaintiff's employment; he was allowed to opt-out.

Plaintiff argues the Arbitration Agreement is substantively unconscionable for three reasons. First, he argues the procedure it outlines is time consuming and he "cannot stop the statute of limitations from running until filing arbitration." (Doc. 39 at 17.) This argument is not persuasive. For one thing, efficiency is one of the aims of arbitration. For another, the Arbitration Agreement by its terms does not appear to prevent Plaintiff from filing a protective lawsuit to stop the running of the limitations period. Second, Plaintiff argues he will be the victim of "unfair surprise" if the Arbitration Agreement is interpreted to apply to claims other than those listed relating to discrimination and harassment. As noted, however the Arbitration Agreement expressly delegates questions about its interpretation or application to arbitration. Finally, Plaintiff argues that any bilaterality under the Arbitration Agreement is "illusory" because it only appears to cover the kinds of claims an employee would bring against an employer, and not vice versa. This argument presumes Plaintiff's interpretation of the Arbitration Agreement and its application; by its terms, the agreement covers employment-related claims brought by either party.

### E.    Plaintiff's Motion for Conditional Certification

Having concluded Defendants may compel Plaintiff to participate in arbitration, the Court declines at this time Plaintiff's request to conditionally certify this case as an FLSA collective action. There is no indication before the Court that any putative opt-in plaintiff could pursue collective action claims in Plaintiff's stead. As another court in this district has observed, "[t]o provide notice to potential opt-in litigants at this time would put the proverbial cart in front of the horse." *Bufford v. VXI Global Solutions LLC*, No. CV-20-00253-TUC-RCC, 2021 WL 229240, at *9 (D. Ariz. Jan. 22, 2021).

## III.    CONCLUSION

In sum, the Court finds Plaintiff has met his burden at this stage to show this Court has personal jurisdiction over Store 106 LLC and venue is properly laid in this district. However, the Court finds Defendants have shown they may enforce Plaintiff's Arbitration Agreement with BFCNE under an alternative estoppel theory. The Court must compel Plaintiff to participate in arbitration to address his claims accordingly. For this reason, the Court will deny without prejudice his request to conditionally certify this case as an FLSA collective action. The Court will exercise its discretion to stay the proceedings pending arbitration, rather than dismiss the case outright. *See Forrest*, 62 F.4th at 1204–05.

**IT IS THEREFORE ORDERED** granting Defendants' Motion to Defer Ruling on Plaintiff's Motion for Conditional Certification (Doc. 29).

**IT IS FURTHER ORDERED** denying Defendant BFCJJS106 LLC's Rule 12(b)(2) Motion to Dismiss for Lack of Personal Jurisdiction (Doc. 25).

**IT IS FURTHER ORDERED** denying Defendants' Rule 12(b)(3) Motion to Dismiss and/or Transfer (Doc. 25).

**IT IS FURTHER ORDERED** granting in part and denying in part Defendants' Motion to Compel Arbitration (Doc. 25). Plaintiff is compelled to participate in arbitration with Defendants pursuant to the terms of the Arbitration Agreement he signed with BFCNE Inc. The Court will not dismiss this matter at this time but will enter a stay pending arbitration, which the parties shall pursue diligently and without delay. The parties shall file a joint report no later than **March 1, 2024**, detailing the status and progress of the matter in arbitration.

**IT IS FURTHER ORDERED** denying Plaintiff's Motion for Conditional Certification of FLSA Collective Action (Doc. 8) without prejudice.

Dated this 1st day of September, 2023.

_____
Honorable John J. Tuchi
United States District Judge